# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

ASTRAZENECA PHARMACEUTICALS LP,

        *Plaintiff,*

    *v.*

GENTNER DRUMMOND, in his official capacity as Attorney General of the State of Oklahoma; and GLEN MULREADY, in his official capacity as the Insurance Commissioner of the State of Oklahoma

        *Defendants.*

Case No. 5:25-cv-1156-PRW

## ASTRAZENECA PHARMACEUTICALS LP'S OPENING BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

RELEVANT FACTS AND BACKGROUND ...................................................................... 3

      A.     The 340B Program and Contract Pharmacy Abuse ..................................... 3

      B.     AstraZeneca's 340B Policy and Resulting Litigation .................................. 6

      C.     Oklahoma Enacts 340B Legislation Mandating Unlimited
            Discounts for Contract Pharmacy Sales ..................................................... 7

ARGUMENT ...................................................................................................................... 9

    I.    AstraZeneca Is Likely to Prevail in Challenging HB 2048 .................................... 9

      A.     HB 2048 Is Preempted by Section 340B .................................................... 15

      B.     HB 2048 Is Preempted by Federal Patent Law ........................................... 21

    II.    AstraZeneca Will Suffer Irreparable Harm Absent Relief .................................... 23

    III.    The Balance of Equities and Public Interest Favor Relief ................................... 24

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Exceptional Child Ctr., Inc.,*
   575 U.S. 320 (2015) ............................................................................................. 25

*Astra USA, Inc. v. Santa Clara Cnty.,*
   563 U.S. 110 (2011) ................................................................................. 3, 17, 18

*Awad v. Ziriax,*
   670 F.3d 1111 (10th Cir. 2012) ................................................................. 23, 25

*Axon Enter., Inc. v. FTC,*
   598 U.S. 175 (2023) ............................................................................................. 24

*Biotechnology Industry Organization v. District of Columbia,*
   496 F.3d 1362 (Fed. Cir. 2007) ................................................... 2, 3, 21, 22

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,*
   489 U.S. 141 (1989) ............................................................................................. 21

*Boyle v. United Techs. Corp.,*
   487 U.S. 500 (1988) ............................................................................................. 10

*Buckman Co. v. Plaintiffs' Legal Comm.,*
   531 U.S. 341 (2001) ........................................................................... 10, 16, 20

*Chamber of Comm. v. Edmondson,*
   594 F.3d 742 (10th Cir. 2010) ................................................................. 23, 25

*Crosby v. Nat'l Foreign Trade Council,*
   530 U.S. 363 (2000) ............................................................................................. 15

*Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. District,*
   541 U.S. 246 (2004) ............................................................................................. 13

*Free the Nipple-Fort Collins v. City of Fort Collins,*
   916 F.3d 792 (10th Cir. 2019) ................................................................. 24, 25

*Kurns v. R.R. Friction Prods. Corp.,*
   565 U.S. 625 (2012) ............................................................................................. 13

*In re MDL 2700 Genentech Herceptin (Trastuzumab) Mktg. & Sales Pracs.
   Litig.,*
   960 F.3d 1210 (10th Cir. 2020) ...................................................................... 15

*Nat'l Meat Ass'n v. Harris*,
  565 U.S. 452 (2012) ................................................................................. 20

*NIH v. Am. Public Health Ass'n*,
  145 S. Ct. 2658 (2025) ............................................................................ 23

*Novartis Pharms. Corp. v. Johnson*,
  102 F.4th 452 (D.C. Cir. 2024) ........................................................ 1, 6, 7, 14

*PhRMA v. McClain*,
  95 F.4th 1136 (8th Cir. 2024) ............................................................ 19, 20

*PhRMA v. Morrisey*,
  760 F. Supp. 3d 439 (S.D. W.Va. 2024) ............................................. 14, 20

*Pryor v. Sch. Dist. No. 1*,
  99 F.4th 1243 (10th Cir. 2024) ................................................................ 9

*Rocky Mountain Gun Owners v. Polis*,
  121 F.4th 96 (10th Cir. 2024) ................................................................ 24

*Safe Streets All. v. Hickenlooper*,
  859 F.3d 865 (10th Cir. 2017) ................................................................ 25

*Sanofi-Aventis U.S. LLC v. HHS*,
  58 F.4th 696 (3d Cir. 2023) ............................................................ 1, 4, 7, 16

*Seila Law LLC v. CFPB*,
  591 U.S. 197 (2020) ................................................................................. 24

*Utah Licensed Beverage Ass'n v. Leavitt*,
  256 F.3d 1061 (10th Cir. 2001) .............................................................. 25

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..................................................................................... 9

*Wos v. E.M.A. ex rel. Johnson*,
  568 U.S. 627 (2013) ............................................................................ 13, 19

*Wyeth v. Levine*,
  555 U.S. 555 (2009) ................................................................................. 10

## Statutes and Constitutional Provisions

42 U.S.C.
§ 256b ........................................................................................ 1, 3, 8, 9
§ 256b(a)(1) .......................................................................................... 4
§ 256b(a)(4) ............................................................................ 4, 15, 19
§ 256b(a)(5) ............................................................................ 9, 18, 19
§ 256b(d)(1) ........................................................................................ 18
§ 256b(d)(3) ........................................................................................ 18

HB 2048
§ 2(1) ..................................................................................... 2, 8, 10, 11
§ 2(2) ...................................................................... 2, 8, 10, 11, 15, 22
§ 4(A) ...................................................................................... 1, 8, 15
§ 5(A) ................................................................................................. 18
§ 5(B) .............................................................................................. 9, 18
§ 10 ...................................................................................................... 8

Okla. Stat. Title 36 § 117 .................................................................. 9, 18

Okla. Stat. Title 36 § 323 ...................................................................... 18

Okla. Stat. Title 69 § 355.1 .................................................................. 12

Okla. Stat. Title 74 § 18b(A)(1) ......................................................... 9, 18

U.S. Const. Article I, § 8, cl. 8 ............................................................ 21

U.S. Const. Article VI, cl. 2 ................................................................... 2

## Regulations

61 Fed. Reg. 43,549 (Aug. 23, 1996) ................................................... 4

75 Fed. Reg. 10,272 (2010) .................................................................... 5

## Other Authorities

*Albany Med Health Sys. v. HRSA*, No. 1:23-cv-3252 (D.D.C. filed Oct. 31, 2023) ................................................................................................. 19

*Amgen Inc. v. Becerra*, No. 1:24-cv-3571 (D.D.C. filed Dec. 20, 2024) ......................... 19

HB 2048 Veto Message (May 17, 2025), https://bit.ly/465JtmW ....................................... 8

Mem., *Premier, Inc. v. HRSA*, No. 1:24-cv-03116 (D.D.C. May 9, 2025), ECF No. 16 ........................................................................................ 14

Tr. of Mot. Hr'g, *AstraZeneca v. Murrill*, No. 6:23-cv-1042 (W.D. La. June 7, 2024), ECF No. 75 ................................................................................................. 14

## INTRODUCTION

Section 340B of the federal Public Health Service Act, 42 U.S.C. § 256b, requires participating pharmaceutical manufacturers to "offer" their products at steeply discounted rates to an enumerated and clearly defined list of providers known as "covered entities." Access to these 340B discounts is valuable to covered entities—and costly to manufacturers—and Congress carefully limited the circumstances in which such discounts must be made available. A number of manufacturers, including plaintiff AstraZeneca Pharmaceuticals LP, sued the federal government to establish that Section 340B does not require them to offer discounts for drug sales at unlimited commercial pharmacies that contract with covered entities (known as "contract pharmacy sales").

Both the U.S. Courts of Appeals for the Third and D.C. Circuits have now ruled that a participating manufacturer's obligation to "offer" discounts under the 340B program does *not* require the manufacturer to make 340B discounts available for sales at "an unlimited number of contract pharmacies." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 461 (D.C. Cir. 2024); *accord Sanofi-Aventis U.S. LLC v. HHS*, 58 F.4th 696, 706 (3d Cir. 2023).

Because *federal law* does not require manufacturers to offer 340B discounts for unlimited contract pharmacy sales, Oklahoma has enacted a statute imposing the same requirement on 340B-participating manufacturers as a matter of *state law*. Known as HB 2048, Oklahoma's law prohibits manufacturers from "deny[ing], restrict[ing], prohibit[ing], or otherwise interfere[ing] with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to a 340B entity." HB 2048 § 4(A).

HB 2048 targets—and indeed, is entirely parasitic on—federal law. It defines all of

its key terms by reference to Section 340B: A "340B drug" is "a drug that has been subject to any offer for reduced prices by a manufacturer pursuant to Section 256b of Title 42 of the United States Code and is purchased by a covered entity as defined in Section 256b(a)(4) of Title 42 of the United States Code." *Id.* § 2(1). And a "340B covered entity" is defined to be "an entity participating or authorized to participate in the federal 340B drug discount program, as described in Section 256b of Title 42 of the United States Code, including its pharmacy, or any pharmacy contracted with the participating entity to dispense drugs purchased through the 340B drug discount program." *Id.* § 2(2). HB 2048 thus requires manufacturers who participate in the federal 340B program to offer their drugs at 340B-discounted prices for unlimited contract pharmacy sales.

Oklahoma's attempt to expand the category of sales for which manufacturers must offer 340B discounts violates the Supremacy Clause in two ways, and AstraZeneca accordingly asks this Court to preliminarily enjoin enforcement of HB 2048 against AstraZeneca. It seeks this relief based on two claims of preemption under the Supremacy Clause of the U.S. Constitution. *See* U.S. Const. art. VI, cl. 2.

*First*, HB 2048 is preempted by Section 340B. The new obligations and restrictions imposed by Oklahoma's law apply to a manufacturer *only* if it participates in the federal 340B program. But no State may engraft costly new obligations under state law onto an existing federal benefits program—especially not one, like the 340B program, that adopts nationally uniform standards and mandates exclusive enforcement by federal agencies.

*Second*, as applied to AstraZeneca's patented products, HB 2048 directly conflicts with, and thus is preempted by, federal patent law. In *Biotechnology Industry Organization*

*(BIO) v. District of Columbia*, the Federal Circuit held that federal patent law "prohibits states from regulating the price of patented goods." 496 F.3d 1362, 1372 (Fed. Cir. 2007). Yet HB 2048 does precisely that: It dictates the price at which AstraZeneca must offer its drugs (all of which are patented), by requiring it to make 340B discounts available for unlimited contract pharmacy sales. Oklahoma law thereby extends federal price controls to a category of patented drug sales (contract pharmacy sales) for which federal courts have held that price controls do *not* otherwise apply. This state-law mandate upends the balance established in federal patent law, which allows innovators like AstraZeneca to charge market-based prices within the period of their federally issued patents.

HB 2048 threatens to inflict irreparable harm on AstraZeneca, which faces the threat of unrecoverable financial losses and unconstitutional state enforcement actions. AstraZeneca therefore seeks an order: (1) declaring that HB 2048 is preempted by Section 340B; (2) declaring that HB 2048 is preempted by federal patent law as applied to AstraZeneca's patented products; and (3) enjoining Defendants from enforcing HB 2048 against AstraZeneca.

## RELEVANT FACTS AND BACKGROUND

### A.    The 340B Program and Contract Pharmacy Abuse

Section 340B of the federal Public Health Service Act "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities," known as covered entities, that provide healthcare to certain underserved populations. *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011). As a condition of receiving reimbursement for its drugs under Medicaid and Medicare Part B, a manufacturer must

enter into a pharmaceutical pricing agreement with the Secretary of Health and Human Services (HHS). 42 U.S.C. § 256b(a)(1). Under the agreement, the manufacturer must "offer each covered entity covered outpatient drugs for purchase" at prices substantially discounted under a statutory formula. *Id.*

Congress originally intended for the 340B program to benefit underserved communities by allowing covered entities to pass on the below-market prices required by Section 340B, called "340B prices," to the "low-income and rural persons" for whom they offer care. *Sanofi-Aventis*, 58 F.4th at 699. That is how the program worked originally. But over time, covered entities realized that if they *did not* pass on the full 340B discount, they could use the program to generate arbitrage "revenue." *Id.* As the Third Circuit has explained, "they turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount." *Id.*

Access to 340B discounts is financially valuable, and Congress limited the reach of the program by delineating fifteen specific categories of covered entities to whom manufacturers must offer 340B prices. 42 U.S.C. § 256b(a)(4)(A)-(O). Notably, contract pharmacies are *not* "covered entities" under the statute.

In 1996, the Health Resources and Services Administration (HRSA), the subcomponent of HHS that enforces the 340B program, issued guidance under which "eligible covered entities that do not have access to appropriate 'in-house' pharmacy services" could enter into an agreement with a *single* outside pharmacy of its choice ("only one site") to provide such services for 340B-priced drugs. 61 Fed. Reg. 43,549, 43,555 (Aug. 23, 1996) (1996 Guidance). Then, in 2010, HRSA released new guidance permitting

covered entities to "use multiple pharmacy arrangements"—that is, an *unlimited* number of contract pharmacies—"as long as they comply with guidance developed to help ensure against diversion and duplicate discounts and the policies set forth regarding patient definition." 75 Fed. Reg. 10,272, 10,273 (2010 Guidance). The 2010 Guidance thus purported to authorize a covered entity to enter into an unlimited number of contract pharmacy arrangements anywhere in the United States.

The 2010 Guidance prompted an explosion in 340B discounts accessed for contract pharmacy sales, enabling outsized profit margins from the resale of these discounted drugs at full price to insured patients. The number of contract pharmacies correspondingly ballooned, from approximately 1,300 in 2010 to more than 33,000 today. Compl. ¶ 33. These contract pharmacies now hold more than 194,000 individual contracts with covered entities. *Id.*

Although contract pharmacy sales occur in the name of the covered entity, they in no way resemble a normal commercial purchase. For instance, covered entities do not maintain title to 340B drugs, and contract pharmacies are typically independent contractors, *not* agents of covered entities, with respect to the acquisition and sale of 340B drugs. *Id.* ¶ 46. Indeed, under the so-called replenishment model, a contract pharmacy sale is merely an accounting exercise designed to invoke the statutory discount for a sale that has already occurred: Eligibility for the 340B discount is not determined until *after* the drug has already been dispensed and paid for at the commercial price established by insurance. *Id.* ¶ 45. As the D.C. Circuit has explained:

While some contract pharmacies maintain separate inventories of section 340B drugs, most fill prescriptions from inventories that intermingle discounted and non-discounted drugs. Only after dispensing the drugs do these pharmacies attempt to discern whether individual customers were patients of covered entities—in other words, whether individual prescriptions were eligible for the discount. Many pharmacies outsource this determination to third-party administrators, who often receive a larger fee for every prescription deemed eligible for the discount. Once the pharmacy or the administrator categorizes a certain number of prescriptions as eligible, the pharmacy places an order to replenish its section 340B purchases. The covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate. Each of these actors thus has a financial incentive to catalog as many prescriptions as possible as eligible for the discount.

*Novartis Pharms.*, 102 F.4th at 457.

In other words, a contract pharmacy sale usually just involves a normal sale that is initially conducted at full commercial prices (paid by a pharmacy customer or his insurer), followed by an after-the-fact determination of program eligibility and a request to "replenish" the dispensed drugs at 340B-discounted prices. This means that a 340B discount is applied for the contract pharmacy sale even though the pharmacy has *also* benefitted from the full insurance reimbursement. The result is significant arbitrage revenue, which the contract pharmacy divvies up with its covered entity and third-party administrator partners. Compl. ¶¶ 34-39.

### B.    AstraZeneca's 340B Policy and Resulting Litigation

In August 2020, to combat the rise of contract pharmacy abuse, AstraZeneca announced that, effective October 1, it would return to the approach set forth in HRSA's 1996 Guidance. AstraZeneca would continue to offer unlimited 340B discounts to covered entities. For each covered entity that lacked its own in-house pharmacy, AstraZeneca

would offer 340B discounts for sales at a single designated contract pharmacy, but would no longer offer 340B discounts for *unlimited* contract pharmacy sales. *Id.* ¶¶ 58-64.

AstraZeneca's policy was and remains fully consistent with the letter and intent of the 340B program—limiting the potential for abuse, while still enabling all covered entities and their patients to access AstraZeneca's medicines at 340B prices. Under AstraZeneca's policy, over 13,000 covered entities that lack an on-site pharmacy, including many in Oklahoma, have registered a contract pharmacy. Decl. of Chris Mancill (Mancill Decl.) ¶ 19, a true and correct copy of which is attached hereto as Exhibit A.

In response to manufacturer contract pharmacy policies, in December 2020, HHS issued an Advisory Opinion asserting that the 340B statute requires manufacturers to make 340B discounts available for unlimited contract pharmacy sales. *Sanofi*, 58 F.4th at 701. AstraZeneca challenged that Advisory Opinion—and a related "violation letter" sent by HRSA—in federal district court. *Id.* at 702. The Third Circuit held that the Advisory Opinion and the associated violation letter were "unlawful," and it "enjoin[ed] HHS from enforcing against AstraZeneca" its "reading of Section 340B." *Sanofi*, 58 F.4th at 706. In 2024, the D.C. Circuit joined in "reject[ing] [the] position that section 340B prohibits drug manufacturers" from restricting discounts for unlimited contract pharmacy sales. *Novartis Pharms.*, 102 F.4th at 461.

### C.    Oklahoma Enacts 340B Legislation Mandating Unlimited Discounts for Contract Pharmacy Sales

On May 12, 2025, the Oklahoma Legislature passed HB 2048. Governor Kevin Stitt vetoed the statute five days later. In his official veto message, the Governor stressed that it

was the "federal" government's job to "reform" Section 340B, not Oklahoma's job. HB 2048 Veto Message (May 17, 2025), https://bit.ly/465JtmW. He also explained that by passing HB 2048, the state legislature had inappropriately "insert[ed] itself into a contractual dispute and tr[ied to] pick winners and losers." *Id.* Despite the Governor's objections, the legislature overrode his veto and enacted HB 2048 on May 29, 2025. The law will take effect on November 1, 2025. HB 2048 § 10.

HB 2048 expressly identifies the federal 340B program as its regulatory object: The title of the act is the "340B Nondiscrimination Act," and the statute defines its key terms— "340B drug" and "340B covered entity"—by direct reference to 42 U.S.C. § 256b. *See id.* § 2(1), (2). The operation and apparent intent of HB 2048 is to compel pharmaceutical manufacturers to make 340B discounts available for sales at an unlimited number of contract pharmacies. Under the law, drug manufacturers shall not "deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to a 340B entity, unless such receipt is prohibited by the United States Department of Health and Human Services." *Id.* § 4(A). Because a "340B drug" is a drug purchased at a discount under the 340B program, *id.* § 2(1), a manufacturer violates the law by refusing to offer its products at 340B-discounted prices to each and every pharmacy under a "contract[]" with a covered entity, *id.* § 2(2)—that is, unless the manufacturer offers 340B discounts for *unlimited* contract pharmacy sales.

HB 2048's sweeping prohibitions contain no geographic limitations; manufacturers must provide discounts even where contract pharmacies are located in other States. Nor does the law require that drugs purchased at 340B-discounted prices be dispensed only to

patients of a covered entity. *See* 42 U.S.C. § 256b(a)(5)(B). HB 2048 also gives manufacturers no right to audit contract pharmacies to confirm their compliance with the law. And although the 340B program is administered by a federal agency (HRSA), HB 2048 does not account for HRSA's enforcement authority or Section 340B's administrative dispute resolution procedure. Instead, manufacturers that violate the law face a $10,000 fine per violation and potential criminal prosecution. HB 2048 § 5(B); *see* Okla. Stat. tit. 36, § 117; Okla. Stat. tit. 74, § 18b(A)(1).

## ARGUMENT

In issuing a preliminary injunction, a district court considers (1) whether the movant is likely to succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the state of balance between this harm and the injury that granting the injunction will inflict on other parties; and (4) the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1250 (10th Cir. 2024).

AstraZeneca satisfies each factor here. HB 2048 is preempted both by Section 340B and by federal patent law. Absent relief, AstraZeneca faces severe and irreparable harm, including unconstitutional enforcement proceedings and unrecoverable economic damage. The balance of the equities and public interest also favor an injunction to maintain the status quo pending a final judgment. A preliminary injunction is thus warranted.

## I.    ASTRAZENECA IS LIKELY TO PREVAIL IN CHALLENGING HB 2048

Either of AstraZeneca's two preemption claims—under Section 340B and the federal patent law—is sufficient for the Court to determine that Defendants cannot enforce HB 2048 against AstraZeneca. Two considerations apply to both preemption claims.

*First*, no presumption against preemption of state law is appropriate here. While a presumption applies in disputes "implicating federalism concerns and the historic primacy of state regulation of matters of health and safety," *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001) (cleaned up), this is not such a case. No presumption against preemption applies when a State attempts to regulate something "inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Id.* at 347. That is true here: AstraZeneca's obligations towards 340B covered entities originate from Section 340B; are governed by Section 340B; and will terminate when AstraZeneca no longer participates in the Section 340B program. 340B sales are thus "uniquely federal" and beyond the States' traditional police power. *Id.* (quoting *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988)).

As its formal name suggests (the "340B Nondiscrimination Act"), HB 2048 directly targets—and in fact is entirely parasitic on—federal law. The law defines all of its key terms, including "340B covered entity" and "340B drug," in terms of their meaning and operation under "Section 256b of Title 42 of the United States Code." HB 2048 § 2(1), (2). Indeed, HB 2048's *only* function is to regulate transactions under the 340B program that are engaged in by participants in the 340B program. If Section 340B were to be repealed, HB 2048 would cease to have any effect.

To be sure, state law has historically provided a "complementary form of drug regulation," including a "layer of consumer protection that complements [federal] regulation." *Wyeth v. Levine*, 555 U.S. 555, 578-79 (2009). But those generally applicable laws regulate *all* drugs, not just drugs sold within a federal program. HB 2048 is different.

It targets sales of 340B drugs (not all drugs) in transactions involving pharmacies that contract with 340B covered entities (not all providers). AstraZeneca is aware of no other context where a presumption against preemption was applied to a law that had no effect other than to regulate the relationship between participants in a federal program—indeed, none where such a state regulation was even *attempted*.

*Second*, HB 2048 regulates drug *pricing*, not distribution: On its face, the law regulates the price that manufacturers may charge in sales to contract pharmacies.

HB 2048 identifies the drugs that it regulates *solely* in terms of their price. A "340B drug" is "a drug that has been subject to any offer for reduced prices by a manufacturer pursuant" to the federal 340B program "and is purchased by a covered entity as defined" by the federal 340B program. HB 2048 § 2(1). The statute requires manufacturers to make "340B drug[s]"—that is, drugs discounted under the 340B program—available to any "pharmacy contracted with the participating [covered] entity to dispense drugs purchased through the 340B drug discount program." *Id.* § 2(2). The only way to comply with the law is to offer 340B-discounted pricing for unlimited contract pharmacy sales; a manufacturer's attempt to use a *different* (market-based) price for contract pharmacy sales violates the statute. Simply put, a law that forbids charging too much is a law that regulates pricing.

Nor does HB 2048 regulate drug acquisition or delivery. AstraZeneca's drugs are available for purchase and acquisition by any covered entity, or for delivery to "any pharmacy" in Oklahoma (albeit not always at 340B prices). Mancill Decl. ¶ 21; *see id.* ¶ 23 (AstraZeneca's drugs are still available everywhere "at commercial prices"); *see also id.* ¶ 20. AstraZeneca's policy also does not affect the delivery of AstraZeneca drugs that have

actually been purchased: No covered entity in Oklahoma has "ever purchased an AstraZeneca drug at a 340B price for sales at a non-designated contract pharmacy but had AstraZeneca (or a wholesaler) refuse delivery of that drug." *Id.* ¶ 22. Instead, AstraZeneca's policy means that "[c]overed entities are not offered—and are thus unable to purchase—AstraZeneca's drugs at 340B prices for sales at non-designated contract pharmacies." *Id.* ¶ 23. The fact that HB 2048 forbids AstraZeneca's policy, which renders covered entities "unable to purchase drugs at 340B prices" for unlimited contract pharmacy sales—even though covered entities *are* able to purchase them "at commercial prices"—further illustrates that the law regulates pricing, not delivery.

Compare HB 2048 to Oklahoma laws that *do* regulate delivery. These laws speak in generally applicable terms about who is authorized to deliver, sell, and possess prescription drugs. *See, e.g.*, Okla. Stat. tit. 69 § 355.1. HB 2048, by contrast, says nothing about any aspect of the acquisition or delivery of drugs—such as how drugs must be dispensed to patients, or their packaging requirements or shipping conditions. Instead, it prohibits conducting a transaction at the wrong *price*. Indeed, pricing is the *only* thing distinguishing a sale that complies with HB 2048 from a sale that violates the law.

Even if HB 2048 could be viewed as addressing acquisition and delivery in some respect, moreover, that *still* would not change its character as a price regulation. There is no meaningful difference between a statute requiring the sale of goods to identified buyers at a specified price ("You must sell me a car for $1"), and a statute mandating delivery of the same goods at that same price to the same buyers ("You may not deny me delivery of a $1-priced car."). Either way, the statute's sole effect is to require manufactures to make

*discounted pricing* available.

"Preemption is not a matter of semantics," and a State cannot avoid preemption "by resorting to creative statutory interpretation or description at odds with the statute's intended operation and effect." *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 636 (2013); *see, e.g.*, *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. District*, 541 U.S. 246 (2004) (dismissing, as "meaningless" semantics, attempt to "treat[] sales restrictions and purchase restrictions differently for pre-emption purposes"); *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 636-37 (2012). This principle is illustrated by *Engine Manufacturers Association*, where federal law prohibited States from "adopt[ing] or attempt[ing] enforcement" of state standards for motor-vehicle emissions." 541 U.S. at 251. Undeterred, California issued regulations "prohibit[ing] the purchase or lease" of noncompliant vehicles. *Id.* at 248-49 (emphases added). The State defended the rules by arguing that federal law did not foreclose States from imposing emission standards as a condition for car purchases—just for sales. *Id.* at 253-54. But the Supreme Court rejected that argument as "meaningless" semantics: "treating sales restrictions and purchase restrictions differently for pre-emption purposes would make no sense." *Id.* at 255. The same reasoning applies here. HB 2048 does not merely govern the "delivery" of 340B-discounted drugs— any more than the California law in *Engine Manufacturers Association* merely governed "sales." The law requires the availability of drugs at the 340B-discounted price, a mandate that—in substance, operation, and effect—functions as a price regulation.

The replenishment model used by contract pharmacies makes this especially clear. Under that model, contract pharmacies "fill prescriptions from inventories that intermingle

discounted and non-discounted drugs." *Novartis Pharms.*, 102 F.4th at 457. The pharmacy dispenses these drugs to *any* patient, whether 340B-eligible or not. "Only after dispensing the drugs do these pharmacies attempt to discern whether individual customers were patients of covered entities—in other words, whether individual prescriptions were eligible for the discount." *Id.* After determining eligibility, "the pharmacy places an order" from the manufacturer at "the discounted [340B] price," which it uses to "replenish" its inventory (where 340B and non-340B drugs are again intermingled). *Id.*; *see* Mem. at 8, *Premier, Inc. v. HRSA*, No. 1:24-cv-03116 (D.D.C. May 9, 2025), ECF No. 16 (HRSA brief describing how replenishment orders for 340B drugs are placed in "neutral inventory" that can be "dispense[d] to 340B patients and non-340B patients alike").

Thus, "[b]ecause the drug is already in the hands of the contract pharmacy even before the patient arrives at the pharmacy, the question is not about delivery of the drug." *PhRMA v. Morrisey*, 760 F. Supp. 3d 439, 455 (S.D. W.Va. 2024). Instead, "[t]he question is only about what price the pharmacy and the covered entity will pay the manufacturer for the replenished drug upon distribution of the 340B Program eligible one." *Id.* As a result, the actual *distribution* (*i.e.*, movement) of 340B drugs is no different from that of non-340B drugs; and the *acquisition* of those drugs differs only in terms of their prices. *Id.* ("[T]he system is about delivery *at a given price*, not delivery *per se*."). Indeed, as an association of covered entities acknowledged in another case, the replenishment model turns 340B contract pharmacy sales into a mere "accounting mechanism," where discounts are applied in an after-the-fact financial "reconciliation." Tr. of Mot. Hr'g at 59, *AstraZeneca v. Murrill*, No. 6:23-cv-1042 (W.D. La. June 7, 2024), ECF No. 75.

### A.    HB 2048 Is Preempted by Section 340B

**1.** A state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (citation omitted); *accord In re MDL 2700 Genentech Herceptin (Trastuzumab) Mktg. & Sales Pracs. Litig.*, 960 F.3d 1210, 1230 (10th Cir. 2020). In enacting Section 340B, Congress carefully balanced the benefits and burdens of participation in the 340B program, such that manufacturers knew what they were agreeing to when they agreed to participate. HB 2048 recalibrates the "burden" side of the scale, upending Congress's careful calculus.

As an initial matter, because the Oklahoma law defines a contract pharmacy to be a "340B entity," HB 2048 § 2(2), it imposes obligations that conflict directly with Section 340B. Congress has specified fifteen categories of covered entities to whom manufacturers must offer 340B prices, *see* 42 U.S.C. § 256b(a)(4)(A)-(O), and contract pharmacies are not on the list. Yet notwithstanding that exclusion, HB 2048 forbids manufacturers (*inter alia*) from "deny[ing], restrict[ing], prohibit[ing], or otherwise intefer[ing] with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to a *340B entity*," HB 2048 § 4(a) (emphasis added), which, given how the law defines that term, means 340B pricing must be made available to contract pharmacies themselves.

Even apart from that fatal flaw, By extending 340B-discounted pricing to unlimited contract pharmacy sales, HB 2048 substantially increases manufacturers' costs of participating in the 340B program. Prior to the law's enactment, manufacturers were required to offer 340B discounts only for a limited category of sales directly to covered

entities, which covered entities used to "turn a profit." *Sanofi*, 58 F.4th at 699. HB 2048 now requires them to make 340B discounts available for an additional category of transactions as well (unlimited contract pharmacy sales), even though the 340B statute itself "does not require" it. *Id.* at 703.

Requiring discounts for those additional sales may enable covered entities and their associated contract pharmacies to "squeeze [more] revenue out of" the 340B program. *Id.* at 704. But it imposes a corresponding burden on manufacturers—from whom the revenue is "squeeze[d]"—substantially changing their costs of participating in the program. As a result of HB 2048, AstraZeneca must now make products like Farxiga and Xigduo, which retail for hundreds of dollars, available for unlimited contract pharmacy sales at 340B prices of *less than a dollar*. Mancill Decl. ¶ 12. Complying with that requirement will result in "approximately $900,000 dollars per month" in losses for AstraZeneca. *Id.* ¶ 27. In effect, Oklahoma has used manufacturers' participation in the federal 340B program as leverage to extract additional money from them under state law. The result is to "exert an extraneous pull on the scheme established by Congress," thus "skew[ing]" the "delicate balance of statutory objectives." *Buckman*, 531 U.S. at 348, 353.

Indeed, HB 2048's interference with federal objectives is unusually clear, because it specifically targets federal law—applying *only* to 340B participants, *only* to 340B drugs, and *only* to pharmacies that contract with 340B-covered entities. It is one thing for a State to impose generally applicable requirements on everyone operating statewide. For instance, States can impose generally applicable licensing requirements on doctors, regardless of their participation in Medicare. But a State may not impose requirements *solely* on

participants in a federal benefits program. For instance, a State could not require hospitals that accept Medicare patients to *also* provide care to all patients aged 55 or older at Medicare rates, even though Medicare begins at age 65. Here, Oklahoma has done something similar: By imposing costly new requirements on manufacturers who choose to participate in the 340B program, HB 2048 upsets Congress's calibration of burdens and benefits for participating in the program.

**2.** HB 2048's disruptive effect on federal priorities is especially strong because if Oklahoma may add to the burdens of participating in a federal benefits program, then so may any other State. Indeed, a growing list of States—including Arkansas, Colorado, Hawaii, Kansas, Louisiana, Maine, Maryland, Minnesota, Mississippi, Missouri, Nebraska, New Mexico, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, and West Virginia—have passed laws that similarly seek to extract additional state-law benefits from the 340B program. A manufacturer deciding whether to participate in the 340B program (and in Medicare and Medicaid, with which it is intertwined) would have to consider, not merely what participation would cost under the federal programs themselves, but also under the separate state laws.

Worse still, each state law is slightly different—creating a hodgepodge of overlapping obligations, enforcement mechanisms, and penalties. Delegation of enforcement powers to individual States frustrates Congress's goal of a national, uniform 340B program. In enacting Section 340B, Congress "centralized" enforcement of its "unitary administrative and enforcement scheme," so that HHS could "administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Astra USA*, 563

U.S. at 119-20 (citation omitted). Congress intended for manufacturers' obligations under the program to be defined by federal law, as interpreted by federal courts and enforced by federal officials. "With HHS unable to hold the control rein"—as here, with Oklahoma asserting its own control—"the risk of conflicting adjudications would be substantial." *Id.*

The 340B statute contains a robust federal enforcement regime, which includes an administrative dispute resolution process, auditing provisions for manufacturers and covered entities, and the possibility of civil monetary penalties in the event of a manufacturer overcharge or diversion by a covered entity. 42 U.S.C. § 256b(a)(5), (d)(1), (d)(3). In *Astra USA*, the Supreme Court held that private entities may not bring actions under state law to enforce the provisions of manufacturers' 340B pharmaceutical pricing agreements. 563 U.S. at 113-14. "Congress made HHS administrator of … the 340B Program," the Court explained, and suits by private entities "would undermine the agency's efforts" to administer the program "harmoniously and on a uniform, nationwide basis." *Id.* at 120. That holding equally precludes state legislation purporting to impose new requirements under the 340B program. Indeed, it would be bizarre for state officials to have *more* leeway than federal officials to impose requirements on participants in the program.

Yet HB 2048 establishes a parallel state enforcement regime, one that encroaches on the federal government's authority to set and define federal enforcement priorities. In conjunction with Oklahoma's other laws, HB 2048 authorizes the Oklahoma Attorney General and Oklahoma's Insurance Commissioner to impose civil and criminal penalties. HB 2048 § 5(A)-(B); *see* Okla. Stat. tit. 36, § 117; *id.* tit. 74, § 18b(A)(1); *id.* tit. 36, § 323. In any state enforcement proceeding, a state adjudicator would be required to consider and

resolve questions of federal law in order to determine whether a manufacturer has violated the statute. Among other things, the adjudicator would need to decide whether the 340B drugs to which the manufacturer allegedly denied or restricted access were intended for "a patient of the entity," as required for 340B eligibility, 42 U.S.C. § 256b(a)(5)(B), a question that turns on the definition of the term under federal law. The adjudicator would also need to determine whether a particular covered entity continues to qualify for participation in the 340B program, which depends on whether the entity sells or transfers 340B-priced drugs to anyone other than its patients or seeks duplicate discounts. *See id.* § 256b(a)(4) (defining "'covered entity'" to "mean[] an entity that meets the requirements described in paragraph (5)," which includes prohibitions on diversion and duplicate discounts). Notably, these very issues are often disputed and have been the subject of federal litigation. *See, e.g., Amgen Inc. v. Becerra*, No. 1:24-cv-3571 (D.D.C. filed Dec. 20, 2024); *Albany Med Health Sys. v. HRSA*, No. 1:23-cv-3252 (D.D.C. filed Oct. 31, 2023)

**4.** Some courts have held that the 340B statute does not preempt state laws similar to HB 2048. *See PhRMA v. McClain*, 95 F.4th 1136 (8th Cir. 2024). But those courts have assumed, without analysis or an evidentiary record, that the state laws regulated "delivery" rather than pricing, *id.* at 1145—ignoring the laws' actual "operation and effect," *Wos*, 568 U.S. at 63. Here, the failure to offer a 340B-discounted price for unlimited contract pharmacy sales is precisely what the law forbids.

But even if HB 2048 could somehow be described as regulating the delivery of 340B-discounted drugs—contrary to how it actually operates—the statute *still* would be preempted. However described, HB 2048 "function[s] as a command to [manufacturers] to

structure their operations" so that 340B-discounted prices are available for unlimited contract pharmacy sales. *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 464 (2012). Whether described as a command to offer 340B discounts for contract pharmacy sales, or as a command to deliver 340B-discounted products for such sales, the law's financial consequences are the same: AstraZeneca is forced to make costly discounts available in circumstances where such discounts otherwise would not be required. This money does not appear out of thin air; it comes from manufacturers like AstraZeneca. *See* Mancill Decl. ¶ 27 ("approximately $900,000 per month"). Even if the money is extracted by means of an ostensible obligation to "deliver" discounted drugs, that costly state-law obligation still skew[s]" the "delicate balance of statutory objectives" that underlies the 340B program. *Buckman*, 531 U.S. at 348, 353.

The courts that have rejected 340B preemption claims, moreover, did not have the benefit of a factual record that addressed the actual operation of the 340B program under the predominant replenishment model. Their decisions accordingly were based on incorrect factual premises that "[c]overed entities purchase and maintain title to the 340B-discounted drugs," *PhRMA*, 95 F.4th at 1144, and that each contract pharmacy "becomes an agent of the covered entity," *id.* at 1142. Those premises are wrong. Compl. ¶ 46. Also, nothing "indicates that the replenishment model" used by most covered entities "was considered by those . . . courts." *Morrisey*, 760 F. Supp. 3d at 456. Here, AstraZeneca intends to seek expedited discovery to address the issues of title and agency as they relate to covered entities using the replenishment model in Oklahoma, and to develop a factual record that will enable the Court to fully evaluate those issues as they bear on preemption.

### B.    HB 2048 Is Preempted by Federal Patent Law

The Constitution vests Congress with exclusive authority to establish a system of incentives "[t]o promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8. Under the federal patent law, inventors are "impelled to invest in creative effort" on the promise that they will obtain "a federally protected 'exclusive right'" to sell their inventions for a limited period. *BIO*, 496 F.3d at 1373. The public can benefit from immediate access to new inventions during the exclusivity period; and after the period expires, the public gets "lower price[s] through unfettered competition." The States are not free to upset that finely calibrated system by seeking to regulate the prices of patented inventions: "Where it is clear how the patent laws strike that balance in a particular circumstance, that is not a judgment the States may second-guess." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152 (1989).

State laws that cap or fix the price at which patented drugs may be sold are thus preempted by federal patent law because they "re-balance the statutory framework of rewards and incentives . . . in effect diminishing the reward to patentees in order to provide greater benefit to . . . drug consumers." *BIO*, 496 F.3d at 1374. The District of Columbia law at issue in *BIO* prohibited patented drugs from being sold "for an excessive price." *Id.* at 1365. The Federal Circuit explained that "[t]he underlying determination about the proper balance between innovators' profit and consumer access to medication . . . is exclusively one for Congress to make," and that the D.C. law was "contrary to the goals established by Congress in the patent laws." *Id.* at 1374. The Federal Circuit accordingly found the D.C. law preempted by the federal patent laws. *Id.*

The same analysis applies to HB 2048, which facially regulates drug pricing. The law requires AstraZeneca to offer its patented drugs at 340B-discounted prices, rather than market prices, for unlimited contract pharmacy sales. Whereas Section 340B caps prices with respect to a limited set of specifically enumerated sales involving covered entities, HB 2048 purports to extend those price caps to an additional category of sales—unlimited contract pharmacy sales—that federal courts have held fall *outside* of the federal program. Pricing is the only thing that distinguishes a sale that complies with HB 2048 from a sale that violates the law. The statute thus functions as a price cap for contract pharmacy sales— one that impermissibly constrains manufacturers' "opportunity" to take advantage of the benefit of exclusivity conferred by Congress "during the patent's term." *Id.* at 1372.

Finally, as above, HB 2048 would be preempted even if (contrary to fact) it regulates drug distribution, rather than pricing. Either way, the law compels a manufacturer to provide covered entities and their contract pharmacy partners with additional "financial resources" for its patented products. HB § 2(2). That costly obligation "in effect diminish[es] the reward to patentees" like AstraZeneca in order "to provide greater benefit[s] to" in-state covered entities. *BIO*, 496 F.3d 1374. However "worthy" Oklahoma deems that objective to be, "it is contrary to the goals established by Congress in the patent laws," which are intended to give a drug manufacturer "the full exercise of the exclusionary power that derives from a patent." *Id.* As applied to AstraZeneca's patented products, therefore, HB 2048 is "preempted by federal patent law." *Id.*

## II.    ASTRAZENECA WILL SUFFER IRREPARABLE HARM ABSENT RELIEF

HB 2048 threatens to inflict two kinds of irreparable harm on AstraZeneca: unrecoverable financial losses and unconstitutional state enforcement actions. Both types of harm have no legal remedy and warrant immediate injunctive relief.

**A.** HB 2048 compels AstraZeneca to provide discounts that cannot later be recouped if the law is invalidated. While Section 340B requires AstraZeneca to offer its products at discounted prices in limited circumstances, HB 2048 substantially expands the category of sales to which 340B pricing obligations apply. As a result, AstraZeneca estimates losses in Oklahoma of "approximately $900,000 per month" if forced to comply. Mancill Decl. ¶ 27. Importantly, once a sale has been made at 340B-discounted prices, there is "no mechanism" under state or federal law for recovering the amount of the discount later if HB 2048 is declared unconstitutional. *Id.* ¶ 28.

As the Supreme Court recently held, an economic injury is irreparable "if the funds cannot be recouped and are thus irrevocably expended." *NIH v. Am. Public Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) (quotation marks omitted). Courts thus find irreparable injury based on allegations of economic harm where, as here, a movant will be unable to sue to recover any monetary damages against a government agency in the future. *See Chamber of Comm. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury.").

**B.** Courts recognize that "[w]hen an alleged constitutional right is involved, . . . no further showing of irreparable injury is necessary." *Awad v. Ziriax*, 670 F.3d 1111, 1131

(10th Cir. 2012) (citation omitted). Instead, "[m]ost courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 805 (10th Cir. 2019); *see id.* at 806 ("[W]ell-settled law supports the constitutional-violation-as-irreparable-injury principle.") That is because "[w]hat makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial," and "[a]ny deprivation of any constitutional right fits that bill." *Id.* at 806. Because HB 2048 violates the Supremacy Clause, AstraZeneca will be irreparably harmed if forced to comply.

AstraZeneca will face other irreparable harms from enforcement of HB 2048 as well. The law empowers the Attorney General to investigate and punish violations. As the Supreme Court recently explained, "[b]eing subjected to unconstitutional agency authority" in an administrative enforcement proceeding is "'a here-and-now injury'" that is "impossible to remedy once the proceeding is over." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023) (citation omitted) (quoting *Seila Law LLC v. CFPB*, 591 U.S. 197, 212 (2020)). AstraZeneca's right against such an "unconstitutionally structured decisionmaking process" would be "effectively lost" if the Attorney General can pursue enforcement proceedings based on HB 2048. *Id.* at 191-92 (citation omitted).

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR RELIEF

The balance of equities and public interest merge as factors when the government is the party opposing the preliminary injunction. *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 112 (10th Cir. 2024). When a party argues that federal law preempts state regulation, therefore, "the court may issue an injunction upon finding the state regulatory

actions preempted." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015); *see Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 906 n.19 (10th Cir. 2017). In this case, both factors independently favor granting relief to AstraZeneca.

Both factors would be "served by an injunction" here because the State "does not have an interest in enforcing a law that is likely constitutionally infirm." *Edmondson*, 594 F.3d at 771. To the contrary, "the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law." *Id.* (citation omitted); *see Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001) (explaining that the public interest favors preliminarily enjoining state statutes likely to be held unconstitutional). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights," moreover, including AstraZeneca's right not to be subjected to unconstitutional state-law obligations and unrecoverable economic losses. *Awad*, 670 F.3d at 1132 (citation omitted); *see Free The Nipple-Fort Collins*, 916 F.3d at 807 (same). And on the other side of the ledger, Oklahoma has no legitimate interest in enforcing an unconstitutional law, such that an injunction preventing enforcement of HB 2048 would not irreparably harm the State.

## CONCLUSION

The Court should grant AstraZeneca's motion for a preliminary injunction.

DATED this 10th day of October 2025.     Respectfully submitted,

*/s/ Paul E. Swain III*
Paul E. Swain III OBA #8785
Paul E. Swain, PLC 2727
E. 21st Street, Suite 420
Tulsa, OK 74114
Tel.: (918) 599-0100
Pswain@Swainlaw.com


Allon Kedem
Jeffrey L. Handwerker
Sam Ferenc
ARNOLD & PORTER KAYE SCHOLER LLP
601 MASSACHUSETTS AVE., NW
WASHINGTON, DC 20001-3743
(202) 942-5000
(202) 942-5999 - fax
allon.kedem@arnoldporter.com
jeffrey.handwerker@arnoldporter.com
sam.ferenc@arnoldporter.com

Carmela T. Romeo
Nicole L. Masiello
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000
(212) 836-8689 - fax
carmela.romeo@arnoldporter.com
nicole.masiello@arnoldporter.com


*Attorneys for AstraZeneca Pharmaceuticals LP*

## CERTIFICATE OF SERVICE

I, Paul E. Swain, hereby certify that on this 10th day of October 2025, the foregoing Opening Brief in Support of AstraZeneca's Motion for a Preliminary Injunction and accompanying Declaration were filed using the District of Oklahoma CM/ECF filing system.

DATED this 10th day of October 2025.        _/s/ Paul E. Swain_____
                                            Paul E. Swain III


                                            *Attorney for AstraZeneca Pharmaceuticals LP*